All rise. Hear ye, hear ye, hear ye. This honorable public court of the 2nd District is now open for suit to appearance. The Honorable Michael J. Burr is presiding. Is he a suit? you're asking the court to weigh and balance these things, you know, you're talking about what is the need, what, where's the showing that was made before the trustees, what they based their decision on to say that a cluster subdivision was appropriate or necessary or needed for the public in this location as opposed to the usual large lot, one acre construction where nobody else has ever built this close to the property line before, all right, versus what does this do to the golf club? What does this do to the golf club? And we've provided some illustrations in the record that you can see, and as I was starting to make a point earlier, you know, you watch a golf tournament on TV, a major PGA championship golf tournament, you know, you don't see private homes in the background with people barbecuing in their backyards and children playing in the backyards. I mean, part of the purpose, and as I said at the outset, I'm not an avid golfer, I don't know that much about golf, honestly, but one of the things that I've learned in studying this and reading about it is, you know, part of golf is, what our experts said in the record, is the purity of the experience, the pristine setting. It is, the point of the golf club is the ability to get away from it all, to be in this very pristine setting, undisturbed by others, where you can play golf and share times with your friends. This property's been zoned residential for how long? I don't know the length of time, probably forever. Since it was acquired by the village, probably. I'm sorry, I would think so. I would think so. Kepler Lakes always knew that this property could be subject to home being built there. Most definitely, there's no question, and we certainly can see that it's zoned for residential development, but the question is the type of residential development, and this is a variance for a cluster subdivision. Did you provide evidence in your complaint or facts in your complaint to show that the tax base would be equal with one acre lots as opposed to these 31 smaller lots? We did not plead at that specifically, no. But that's an inference that we do think you can fairly draw from this, is the standpoint that if it's 29 homes on one acre lots versus 31 homes with a higher density, I think that, again, that would be a subject of evidence, you know, and that's part of the problem. But we are a fact pleader, so if you want to make a LaSalle claim, you should maybe back it up with some facts, right? Well, I think that we pleaded sufficient facts to get past the motion to dismiss here. I mean, we have talked about the surrounding uses and how they differ. We've talked about the lack of any apparent justification for deviating from what the ordinances would ordinarily require with this type of development. We've talked about, we've pled very specifically the safety factors, safety corridors that need to exist under these types of developments. I mean, that's not just a burden on the golf club in terms of its impact on its ability to host tournaments. That's a burden on the community, too, from a safety factor for the people who live in this development, ultimately, as to what they're exposed to. And, again, there's no indication that any of this was considered by the trustees when they voted and how they resolved the split of opinion that existed on the planning commission. Earlier, you specifically mentioned that these ordinances destroyed the value of the golf club. Yes. What did you plead in that regard? Well, what we have in the record is an opinion by a golf course design professional. It's attached as Exhibit G to our complaint and incorporated by reference in Paragraph 21 of the complaint. And in that opinion letter that the golf professional wrote, he talks specifically about the hazards that are created under this particular design for the opportunity because the technology has changed with respect to golf. Golf clubs now can hit balls much farther at much greater velocity. When Kemper Lakes was built, that was before a lot of this technology came into play. So there's a much greater hazard that exists. There have to be slightly different golf corridors that exist when it's adjacent to a residential property. And he also pointed out that when you destroy that aesthetic that exists on the golf course and remove all the trees, I mean, they're talking about cutting down over 3,000 trees to create this particular subdivision, and you have now houses appearing right there on the edge of the golf course, that from the standpoint of desirability for golfers and from the standpoint of its desirability as a site, a host site for the Professional Golf Association, to have tournaments hosted there, it becomes undesirable. And that's what affects it. Were there variances regarding the trees? The cut down of the trees, was that within the zoning as it stands right now, as it stood before? I'm not sure I understand your question. Were there variances granted for cutting of trees? Not for cutting trees, but on the number of trees that need to be replaced. There was a variance granted. And they only required them, I don't remember the exact number, but they only required them to plant, I think, about 172 trees when the zoning would otherwise could have required I think over 400 to be planted. So there was a reduction in the replacement requirement. I have a quick question on count three. You allege that this capping, that the plans show that the well is capped on the 13th hole. Yes. The plans show that. Yes. Is there evidence in your complaint, or FAFSA alleged in your complaint, that the well is actually capped? What I will direct you to, no, because I didn't have that at the time. We didn't have that at the time the complaint was filed. What I can show you and what is appended in the appendix to our reply brief is our documents on file and another action that is pending between the parties in which Taylor Morrison wrote a letter to our client that specifically says we have decided we are capping the well and we will not provide water to hole 13. So that doesn't exist. And another action was filed based on that. Yes, that we're asking you to take judicial notice of that fact to support that issue because the 2619 motion that the trust filed over that issue, and that's another basis for reversal, that 619 motion has no affirmative evidence whatsoever attached to it to show, in fact, that the contract was not breached and that there was no, that the well was not capped. But what we do have that we ask you to take judicial notice of is that actual statement by Taylor Morrison that the well is capped and they will not provide water to hole 13. That is attached in the appendix to our reply brief. Anything else? No. All right. Thank you, counsel. You will have time for rebuttal. You may proceed. May it please the court and counsel, Jason Mennick on behalf of Taylor Morrison, Illinois. We are the contingent contract purchaser and potential developer of the preserves development. I will be addressing counts one and two in the circuit court's proper dismissal of those counts, and Ms. Pinto will address count three. The main problems that the golf club has with this case are that they didn't use the right due process claim. Despite what counsels represented this morning, what the golf club's counsel previously argued in response to motions to dismiss and in oral arguments is that its challenge was based upon 11-13-25 of the Illinois Municipal Code. And as this court knows from its recent decision in Conaghan v. City of Elgin, those are not the proper keys to the courthouse in order to assert that claim. It didn't count one site, section 2701? It did cite it in the title. However, what is actually pled and what was relied upon by counsel was clearly the Illinois Municipal Code. Well, the prayer for relief asks for a declaratory judgment, correct? It asks for a declaratory judgment. I agree with that. Isn't that what Conaghan kind of, if not says, at least alludes to the fact that those aren't the keys to the courthouse? What Conaghan says is that the keys to the courthouse are that you can rely upon, for example, a declaratory judgment act or some other things. However, what we saw in the golf club's appellate brief in the reply is that it was allegedly asserting a common law claim. They have not raised any sort of declaratory judgment claim. They didn't raise that as part of their appeal and they didn't raise that in their opening brief. It was only in the reply brief that they finally decided to pick what their keys to the courthouse are. Those keys were never provided at the circuit court level. They are left without proper jurisdiction before the circuit court to decide a due process claim. The other major problems that the golf club has with this case is that they play a case based upon a theoretical nuisance and about removal of trees that they don't own and do not have a protected right to. As your honors know, nuisance is not allowed in Illinois and it is not allowed to continue. The golf club would have other avenues should there be a nuisance at some future point in time. However, alleging that and trying to disguise it as a due process claim should not be allowed. What they actually alleged multiple times is that there would be this alleged nuisance between neighboring homeowners and combative golfers and that is just far too speculative to assert as applied due process claim. In fact, at no time did the golf club argue that there was a high density housing problem. That is a new issue that was raised for the first time on appeal. They simply did not raise that. What we know is that the golf club was present and participated in village hearings and its pleadings. We know that in an oral argument, it's undisputed that the golf club agreed that residential development next to the golf club was beneficial to the golf club. Exhibit A to the second amended complaint contains the contract for easements in which the golf club has stipulated that such development would be agreeable for the golf club. Yet here we are with the golf club now saying that actually they have a problem with residential development next door to the golf club. There are no cases in which surrounding property owners need to cede to a golf club atmosphere in order to proceed with their development. It simply is not a due process claim. On each of the LaSalle factors, the golf club did not really assert facts. They are very theoretical and very loose descriptions of the LaSalle factors and they've pled themselves out of those LaSalle factors by attaching the volume of information included with their second amended complaint. We know that all of the surrounding zoning is R1 and the land uses are residential zoning. It's not disputed. As to the diminution in value, the alleged opinion is really just a conclusory statement that's not an affidavit as we might expect. It does not provide facts of how this individual came to any sort of valuation and simply it does not provide us with any sort of indication of how anyone would ever come to the determination that there would be a diminution in value because of a residential development next door. You would think that a golf club that has had a series of developments next door would be able to plead how it's been damaged or how it's been protected from damage when other developments have gone in place, but they didn't do that. They haven't pled any facts as to any alleged damage. When we're looking at the comparison of the hardship to the private property owner, the golf club, and the benefits of the public, simply it's very obvious that that has to weigh in favor of the public and the village because there is no damage. Those two factors automatically weigh in favor of the defendants in this case, but the golf club has stipulated begrudgingly that there is a benefit to have 31 homes developed. It provides housing to the community. It expands the economic tax base. Frankly, there is no justification to question whether or not this is the best possible source of tax revenue. If there was some better developments that might have generated the same or more taxes, that really misses the point because the LaSalle factors do not require that sort of analysis. Is it a reasonable inference that 28 or 29 homes would generate the same tax base? I have no facts to say that that's an inference. I'm assuming that they would generate some tax base, but there are no facts that I can point to to tell you that they would generate the same or substantially the same. We frankly just don't have that sort of analysis as part of the record. Again, this is very theoretical pleading on behalf of the golf club that maybe there was some better developments that they thought of, but that really is not what the LaSalle factors look at. Looking at the fifth LaSalle factor, it's clear that the proposed use for the land as residential development is suitable because it's been zoned residential far before this case was filed, and the golf club has stipulated that residential development is appropriate. All of these tangents about whether or not the village complied with its own zoning ordinances are really off the mark. Not only is the golf club relying on the purpose sections of the zoning code, but they also point to section 5-14-3 of the Kildare Municipal Code, under which the village is allowed to for forestry and for density, so long as they find that it's in the best interest and welfare of the municipality. In fact, the village of Kildare made such exemptions and made such findings, and your honors would find that in the record as part of the pre-approval process. The plan commission made those findings, which were then adopted into the pre-approved plan as 15-0-005, and then which were again later adopted with the final plan, 16-0-008. Going to the sixth LaSalle factor and to the two Sinclair factors, the length of time the property has been vacant, and whether or not there's a community need for the proposed development and the care with which the community has planned, it's obvious. First of all, the golf club has not alleged any of those facts, just showing that they are more vulnerable to dismissal on a LaSalle factors claim, and they haven't argued those facts on appeal. However, the record shows that care was taken to plan for the preserve's development. There were multiple hearings before the village. The golf club participated in those hearings, and they brought people with them to voice their objections. So those allegations that there was some sort of arbitrariness that they want to explore is unfounded. Frankly, all of the golf club's concerns were voiced, considered, and there were modifications made between the preliminary approval and the final approval, showing that the village had made careful consideration. So on those last three LaSalle factors, although the golf club never pled them, they would favor the village of Kildare. Are these plans, if not contradictory to the letter of the municipal code, at least the spirit of it, particularly 5-14-1 and some of the other code sections that were signed by the golf club? They're not contrary. However, those guiding principles as the purpose sections of the zoning ordinance are not mandatory language, as we know under the Kane case. Those are merely guideposts, and the village is the ultimate decision maker as to the extent to which it follows those guideposts. So they are goals of the village, certainly. However, these are not absolutely mandatory, must be followed to the letter requirements in allowing a special use, so long as the village makes consideration of what's in the best interest for the municipality. And with respect to, for example, for the forestry issues, the commissioners were all in agreement that the number of trees being replaced was not so important. What was important was that there was a good forestry plan. Because had the village followed the number of replacement trees to the letter of the ordinance, it would have required overpopulation of trees. And the planning commission made those findings as part of the preliminary approval. So careful consideration was given. I see that I'm out of time. I don't know if you have any further questions. The 3,000 trees that are there now, I'm assuming, are definitely an overpopulation of trees. They're basically scrub trees. And that number 3,100 is a number that I cannot verify. Good forestry practices would probably dictate removing hundreds of those trees anyway. Indeed, it does. Thank you, Your Honor. Thank you, Counsel. Ms. Pinto? I think you're here to talk about count three, if I'm not mistaken. I am, Your Honor. May it please the Court, Joy Pinto appearing on behalf of the Land Trust, Trust Number 0315074 and CDBNA LLC. CDBNA LLC is the beneficiary of the Land Trust. The member of CDBNA LLC is now Heartland Bank and Trust Company. And that's important to note because at the time that the parties were negotiating the contract for easements, it was part of a deed of move transaction in which Heartland Bank was accepting back into the bank, the property at issue in this case, the preserves. For its final attempt at a cause of action, in count three, the golf club solely seeks against the land trust for the land trust's alleged breach of the contract for easements. The contract for easements, like I mentioned, was negotiated at the time we were negotiating a deed of move with an entity that is related to the golf club. The contract for easements was to serve to memorialize the agreements between the land trust and the golf club related to the future development of the preserves. The contract for easements specifically says that both the land trust and the golf club acknowledged that the preserves was to be developed as a residential subdivision. However, since the bank had no intention of developing the preserves on its own and the precise location of roadways and houses in the preserves had not yet been established, the golf club and the land trust agreed that the location and size of the subject easements would also involve the input of the future contract purchaser, in this case Taylor Morrison, and the governmental entities like the Village of Kildare. Count three of the second amended complaint erroneously asserts that the land trust breached the contract for easements when Taylor Morrison, as the contract purchaser, failed to depict certain easements as required under the contract for easements in its final site and engineering plans that it submitted to the Village of Kildare solely for approval of the PUD. The land trust acknowledges that these easements are not depicted on the final site and engineering plans. However, the land trust objects to the conclusion that their exclusion means that they will not be provided. The final site and engineering plans were prepared in compliance with what was required by the Village of Kildare under the PUD plan unit development requirements. The exclusion of the easements from the final site and engineering plans does not mean that they will not be provided, only that the easements were not required for approval of the plan unit development. And this is the subject, at least part of it, of another lawsuit now? It is, Your Honor. So subsequent to this case, when this case was dismissed, and it's important to note also that count three was dismissed without prejudice. It's the only count that was dismissed without prejudice. So in terms of future pleading, they have leave to do that. Affirmatively, there are certain easements. The easements for a hundred reasons provide for beneficial easements to both the land trustee and the golf course as it relates to the future development of the preserves that kind of serve to protect both parties' interests. Currently, we have made a request for the golf club to execute certain easements that are necessary for Taylor Morrison's development of the preserves that's beneficial to the preserves. They declined to execute those easements, so we have brought an action in state court, in the circuit court, excuse me, asking for them to sign those certain easement agreements. So there is pending litigation. What is referenced in the golf club's reply brief is an affirmative defense that the golf club brought in defense of our count two in that action, which is also a breach of contract for easement claim. And it's important to note that on the motion to dismiss that count, the affirmative defense count two was dismissed, and they were granted leave to replete. So what was raised in that reply brief was actually eventually abandoned by the golf course in their circuit court action. The only specific that I saw in the complaint related to this well on hole 13, correct? Correct. The well on hole 13 has not been capped. There's been no development construction action on behalf of Taylor Morrison. They don't own the property. The bank still owns the property, or the land trust still owns the property. We can't get to the point of finalizing the sale because of the litigation and the roadblocks that we've run into. So there is no capping on the well on hole 13. It's shown on the final site plans that were submitted in support of the PUD, but that does not mean that there will not be an alternate water service provided. It's just that the easement for that was not required as part of the PUD. It's going to be part of the building permitting process if and when Taylor Morrison ever completes the purchase of the property, if and when they get to that stage. Thank you. Mr. Benson, rebuttal argument. I'm usually here on the defense side, so it's always peculiar for me to argue as a plaintiff, but I've had this recited to me so many times. We are here on a 2-6-15 motion to dismiss. We have a well-established Illinois Supreme Court case, the LaSalle case, that sets forth the factors that you have to plead if you want to challenge something on substitute process grounds. We are entitled to the favorable inferences that can be drawn. Mr. Metnick spends a lot of time trying to put labels on the complaint, and we know from a plaintiff's perspective that it's the substance of the complaint that we're supposed to be looking at here. And when you look at the substance of the complaint, what's clearly being alleged is that the approval of this particular cluster subdivision was arbitrary for some very specific reasons, including failing to follow guidelines that the community has with respect to this type of development. It clearly alleges an undue burden and the harm and diminution in value that will affect the golf course. Those things have to be accepted as true. I don't have to append to my complaint an affidavit from an expert witness in order to state a cause of action. These allegations have to be accepted as true, just like the allegation in the complaint that the well at Hole 13 has been capped. For Ms. Pinta to step up here and say it hasn't been capped is all well and good, but on a 2-6-19 motion, she needs to have some affirmative evidence of that, and there is none in this record. So, you know, from the standpoint of Does the complaint say the well was capped or the complaint say that the plans show the well being capped? As I stand here right now, I honestly don't recall. I think it says that it's capped, okay? But even if it only says that it's shown as capped, when you combine that with the statement in what's appended to our reply brief, I still think that they have to come forward with some affirmative matter to show that it's not, if they're going to beat it on a 2-6-19, if our allegations are accepted as true. From the standpoint, you know, again, Mr. Medvek argues all of the things that we've alleged in our complaint are speculative, and we should just wait until, you know, everything we say is going to go wrong goes wrong, and then we can bring a nuisance action. But when you look at the cases that have addressed these types of substitute process claims, you know, they're all brought in this posture before the development has been built because you're challenging the authority that is simply granting the variance. So to some extent, as other courts have pointed out, confronted with these types of cases, it's very difficult to expect someone to plead with the level of specificity and the type of evidence that, you know, Mr. Medvek is trying to demand here. Certainly all we can do is present the facts and the allegations that from a golf professional standpoint, this is the diminution in value that will occur. No different than in Rodriguez's case where the landowners, the adjacent landowners, said it's going to create more congestion in our area. You know, that's the same types of allegations that get sustained for purposes of simply stating a cause of action. We're not here to try the case on the basis of the party's arguments. You know, the hearings, there's no question that there were hearings in front of the planning commission, but we're talking there about procedural due process, and this is a claim of substitute process. You know, another point, you know, Mr. Medvek refers to the trees that are going to be cut down as scrub trees. Well, I don't even know what that is, but where's the evidence of that? You know, these are all evidentiary matters that we're talking about here, and the issue in the case is simply the sufficiency of the complaint. You say they're evidentiary matters, but matters that were considered in approval of the plan, correct? Certainly, it's from a procedural due process, yes, but from the standpoint of what kind of a burden does that impose on the golf club as a result of a decision to remove them and the effect that it has, is that in effect a taking, an unconstitutional taking of our property or the use of it or the benefit or value of it without proper consideration of its effect. That's what we're talking about there. The taking of your property? You're saying the trees are your property? No, I'm not saying the trees are our property. I'm only talking about the taking from the standpoint of value. The diminution of that? Yes. Yeah, there's no question, and that was another thing, you know, that the trial judge seemed to focus on was the idea that, you know, somehow these trees had to be on our property before we could object to their removal. And, you know, one of the points of virtually all the cases that we've cited here, Rodriguez, Forest View, Amalgamated, all those cases deal with the question of neighboring property owners who are alleging problems because of how neighboring property is going to be developed. And that's all we're doing here, too. So we have the appropriate standing. Judge Barones ordered dismiss count three without prejudice, correct? Yes, that's true, Judge. Refresh my memory. Were there subsequent orders that you indicated you were standing under the pleadings as filed and that dismissal terminated being one with prejudice? There were not. Not that I'm aware of. But there is nothing left pending in front of the circuit court. What do you think the orders are? All right. We thank the attorneys for their arguments today. The case will be taken under advisement. Thank you, Your Honor. And in due course. Thank you.